UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CAROLYN KOBASHER**,

      Plaintiff,

vs.

**MVC CLINICAL PRACTICE-MI PC**,
A Michigan professional corporation,
d/b/a **METRO VEIN CENTERS**,
**A and G Aesthetics PLLC**, a
Michigan professional limited liability
Company, d/b/a **METRO VEIN CENTERS**,
**MVC MSO LLC**, a Delaware corporation,
And **ALBARON PARTNERS LP**,
A New York Limited Partnership,

      Defendant.

**DEMAND FOR JURY TRIAL**
Case No: 20 -
Honorable:

---

**Gregory A. Jones (P75318)**
GASIOREK,  MORGAN,  GRECO,
McCAULEY & KOTZIAN, P.C.
30500 Northwestern Hwy, Ste 425
Farmington Hills, MI 48334
P: (248) 865-0001
F: (248) 865-0002
gjones@gmgmklaw.com
rdonegan@gmgmklaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES, Plaintiff, CAROLYN KOBASHER, by and through her attorneys, GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C., and for her complaint against Defendants, MVC CLINICAL PRACTICE-MI PC; A and G AESTHETICS, PLLC; MVC MSO, LLC; and ALBARON PARTNERS, LP (collectively, "METRO VEIN CENTERS") hereby submits the following:

1.     This complaint arises out of the wrongful termination of Plaintiff's employment with Defendant in violation of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), the Michigan Whistleblower's Protection Act, M.C.L. § 15.361 et seq., and in violation of established public policy in Michigan, after Plaintiff raised concerns that Defendant's employees were intentionally misreading diagnostic studies in order to justify unnecessary procedures, thereby defrauding patients, private health insurance companies, and the State and Federal government.

## PARTIES

2.     Plaintiff, CAROLYN KOBASHER (hereinafter, "KOBASHER"), is an individual residing in the City of Lorain, County of Lorain, State of Ohio.

3.     Defendant, MVC CLINICAL PRACTICE-MI PC is a Michigan Professional Corporation which does business and operates as METRO VEIN CENERS (hereinafter, "MVC Clinical Practice" or "METRO VEIN

CENTERS") with offices and a principal place of business in West Bloomfield, County of Oakland, State of Michigan.

4. Defendant A and G Aesthetics PLLC is a Michigan professional limited liability corporation which also does business and operates as Metro Vein Centers (hereinafter, "A and G Aesthetics PLLC" or "METRO VEIN CENTERS") with offices and a principal place of business in West Bloomfield, County of Oakland, State of Michigan.

5. Defendant MVC MSO LLC is a Delaware corporation with offices and a principal place of business in West Bloomfield, County of Oakland, State of Michigan, where it manages the operations, human resources, and other functions of Metro Vein Centers and employs individuals who work or Metro Vein Centers (hereinafter, "MVC MSO" or "METRO VEIN CENTERS").

6. Defendant ALBARON PARTNERS LP (hereinafter "ALBARON") is a New York Limited Partnership with offices in Long Island, New York, and West Bloomfield, County of Oakland, State of Michigan, and it owns and operates METRO VEIN CENTERS.

## JURISDICTION AND VENUE

7. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

3

8.     This Court has subject matter jurisdiction over KOBASHER's claims under and pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. § 1332 (diversity jurisdiction), and 31 U.S.C. §§ 3730 and 3732(a) (False Claims Act).

9.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over KOBASHER's pendant state claims for violations of the Michigan Whistleblowers' Protection Act, M.C.L. § 15.361 *et seq.*, the Michigan Health Care False Claims Act, M.C.L. § 752.1001 *et seq.*, and the Michigan Medicaid False Claims Act, M.C.L. § 400.601 *et seq.*

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) as the judicial district wherein a substantial part of the events or omissions giving rise to KOBASHER's claims occurred and 31 U.S.C. § 3732(a) as the judicial district within which Defendants transact business.

## COMMON FACTUAL ALLEGATIONS

11.     KOBASHER is a registered vascular technician.

12.     METRO VEIN CENTERS operate as a clinical practice specializing in the diagnosis and treatment of varicose veins, spider veins, and other venous conditions.

13.     METRO VEIN CENTERS hired KOBASHER in or about December 2017 as an ultrasound technician.

14.    While employed as an ultrasound technician, KOBASHER was instructed by METRO VEIN CENTERS' ultrasound manager that she should find reflux at the saphenofemoral junction for every single patient she examined in order to justify procedures performed by METRO VEIN CENTERS' physicians.

15.    KOBASHER objected to this instruction on the basis that it constituted illegal and unethical fraud.

16.    KOBASHER raised these objections to METRO VEIN CENTERS Chief Compliance Officer, Dr. Max Hutton, who shared her concerns.

17.    In or about July 2019, the Ultrasound Manager who had instructed KOBASHER to misread diagnostic ultrasounds left her position.

18.    On or about September 1, 2019, KOBASHER was promoted to Ultrasound Manager at the recommendation of METRO VEIN CENTERS' Chief Compliance Officer, Dr. Max Hutton.

### Initial Work With the Compliance and Quality Assurance Team

19.    Recognizing a pattern of concerning practices in diagnostic studies at METRO VEIN CENTERS, Dr. Hutton established a Compliance and Quality Assurance Team in or about October 2019.

20.    KOBASHER was appointed to the Quality Assurance Team with the goal of making sure that ultrasounds were not being misread to justify unnecessary procedures.

21.    As part of their efforts in the Quality Assurance Team, KOBASHER and Dr. Hutton identified the METRO VEIN CENTERS location in Florham Park, New Jersey as a clinic of potential concern.

22.    Specifically, upon review of the records at the Florham Park office, it appeared as though virtually every patient who went through the office was found to have venous insufficiency (a condition related to improper vin performance, which requires medical intervention).

23.    Due to these concerns, KOBASHER visited the Florham Park facility in late 2019.

24.    During her visit, KOBASHER met with two ultrasound technicians, "KC" and "LM."

25.    KOBASHER discussed her concerns related to the peculiarly high percentage of patients that were found to have abnormalities. During this discussion, one of the technicians, KC, broke down in tears and admitted that the technicians had been instructed that if they did not find reflux on every examination they would be terminated.

26.   Likewise, KOBASHER audited the METRO VEIN CENTERS location in Clinton Township, Michigan.

27.   KOBASHER noted that a technician at the Clinton Township location, "TS", was similarly finding an abnormally high percentage of patients with venous insufficiency in order to justify medical procedures.

28.   KOBASHER addressed these concerns directly with TS who acknowledged her errors and indicated that she would improve.

29.   KOBASHER continued to monitor TS and KC's performance. In each case, their performance slightly improved after KOBASHER's initial conversation, but then regressed to the unethical and fraudulent practices over time.

### Kobasher is told to "Back Off"

30.   On or about February 28, 2020, Dr. Marwan Hammoud, the physician at the Florham Park clinic, sent an e-mail to KOBASHER, Chief Operating Officer Art Golden (hereinafter, "GOLDEN"), Director of Operations Jacob Murphy, and Dr. Max Hutton, asking "What exactly is going on?" and adding "I'm hearing constant complaints and frustration from our techs daily. It affects their daily work. First about their hours, now this. They feel singled out and honestly close to filing a harassment complaint with HR."

7

31.   After receiving this email, GOLDEN called KOBASHER, and told her that she needed to "back off."

32.   Thereafter, GOLDEN responded to Dr. Hammoud's e-mail and suggested, "Let's table this."

33.   In or about March 2020, METRO VEIN CENTERS fired Dr. Hutton as Chief Compliance Officer.

34.   On or about March 20, 2020, METRO VEIN CENTERS temporarily ceased operations due to the COVID-19 pandemic.

35.   KOBASHER returned to work on or about May 4, 2020. When she returned, KOBASHER was told that she was to focus on scanning full-time.

36.   The full-time scanning schedule interfered with KOBASHER's ability to effectively operate as Ultrasound Manager and curtail improper diagnostic reads at METRO VEIN CENTER facilities.

37.   Upon information and belief, METRO VEIN CENTERS required KOBASHER to return to scanning full-time in order to curtail her efforts to oppose the ongoing fraudulent practices at the clinics.

### Kobasher Reports Concerns About Ongoing Fraud

38.   On or about June 2, 2020, KOBASHER sent an e-mail to Chief Executive Officer Dimitri Ivanov (hereinafter, "IVANOV") expressing her

concerns about the lack of dedication to ensuring legal compliance at METRO VEIN CENTERS. In this email, she noted as follows:

     a. "…I am now scanning full time. Previously, I had a full-time position reviewing images and coaching the ultrasound staff to not only ensure the best patient experience but also to ensure compliance with the law."

     b. "A recent audit was conducted for the Florham Park office and I was asked to 'back down' and we would implement a corrective action in about a month. That was in February 2020. This audit needs to be completed and the performance standards must be addressed."

     c. "My concerns are that the previous ultrasound manager required a technologist to "find reflux." They were instructed that they would be replaced if they could not demonstrate this"

     d. "I am advising you that we currently have a handful of vascular technologists that are over measuring reflux, measuring noise, augmenting with their probes, over measuring veins, etc. in order to provide a study for the physician to treat patients. Many but not all of these patients truly have disease. We must be able to demonstrate with proper imaging that the patient definitely has disease, otherwise it can become legally problematic if we are scrutinized by a variety of compliance organizations."

     e. "A fulltime scan schedule and the removal of compliance support from Dr. Hutton and Dr. Pannu makes it virtually impossible for me to ensure that the integrity of the ultrasound program is in fact up to par."

39.   IVANOV called KOBASHER after receiving her e-mail on or about June 2, 2020. During this conversation he indicated that he

appreciated her concern, but need her to be focused on scanning full-time in order to focus on increasing revenue.

40.    On or about June 9, 2020, KOBASHER filed a formal complaint with the U.S. Department of Health and Human Services Office of Inspector General, reporting the ongoing fraudulent activity at METRO VEIN CENTERS.

41.    On or about July 21, 2020, KOBASHER sent an e-mail summarizing performance reviews of METRO VEIN CENTER ultrasound technicians to GOLDEN, IVANOV, ADESINA, and Chief Medical Officer Dr. Mason Mandy.

42.    In this e-mail, KOBASHER raised concerns with ongoing unethical practices, and specifically noted that ultrasound technicians were inverting their spectral Doppler while performing ultrasounds, resulting in inaccurate findings of venous reflux.

43.    KOBASHER also specifically discussed Florham Park technician KC. She noted that "[KC] has made some improvement, although she is continuing to use unethical techniques to document reflux that is false." KOBASHER included a spreadsheet with specific examples of KC's false readings.

44.     KOBASHER attached "Quality Assurance Audit" documentation to support her concerns.

45.     Specifically, KOBASHER attached a July 21, 2020 "Quality Assurance Audit" for METRO VEIN CENTERS technician KC. She specifically noted as follows:

> [KC] is not following proper protocol in regards to the diagnostic quality of her imaging. The technologist is using unethical techniques to demonstrate reflux, including; augmenting with her probe, overmeasure spectral Doppler tracing to get to or over 500msec, and measuring noise on the spectral tracing to demonstrate reflux that is not evidence. [KC] reduces the scale when imaging the superficial system and this causes above the baseline noise that is being measured as reflux.
>
> All of these techniques cause a patient to receive procedures that are not medically necessary. This practice is unethical and fraudulent.
>
> Metro Vein Centers and the physician could be liable for prosecution under the CMS guidelines.
>
> **I am informing you that this practice must cease immediately.**

46.     KOBASHER also attached a July 20, 2020 Quality Assurance Audit for METRO VEIN CENTER technician "ND," which stated as follows:

> It appears that if a patient does not have very evident venous insufficiency the technologist is using unethical techniques to demonstrate reflux, including; inverting her spectral Doppler to have normal flow show above the baseline and measure

11

as reflux, overmeasure spectral Doppler tracing to get to or over 500 msec, and measuring noise on the spectral tracing to demonstrate reflux that is not evident.

All of these techniques cause a patient to receive procedures that are not medically necessary. This practice is unethical and fraudulent.

Metro Vein Centers and the physician could be liable for prosecution under the CMS guidelines.

***I am informing you that this practice must cease immediately.***

47.     KOBASHER also attached her July 20, 2020 "Quality Assurance Audit" for METRO VEIN CENTERS technician "SM," and again reiterated as follows:

[SM] is not following proper protocol in regards to the diagnostic quality of her imaging. It appears that if a patient does not have very evident venous insufficiency the technologist is using unethical techniques to demonstrate reflux, including; inverting her spectral Doppler to have normal flow show above the baseline and measure as reflux, overmeasure spectral Doppler tracing to get to or over 500msec, and measuring noise on the spectral tracing to demonstrate reflux that is not evident.

All of these techniques cause a patient to receive procedures that are not medically necessary. This practice is unethical and fraudulent.

Metro Vein Centers and the physician could be held liable for prosecution under the CMS guidelines.

> ### *I am informing you that this practice must cease immediately.*

48.   KOBASHER continued in the aforementioned e-mail correspondence to note that many of METRO VEIN CENTERS' ultrasound technologists were trained by an individual who "was released from the corporation due to the poor quality of her studies and the unethical techniques that she was using to create or document false reflux."

49.   KOBASHER concluded by noting that her goal when given the position was "to make this the strongest group of vascular technologists in the industry" and that "[i]t is imperative that I have the support to correct the imaging pitfalls so that everyone is doing the right thing."

50.   On or about July 21, 2020, KOBASHER received a call from GOLDEN and METRO VEIN CENTERS Chief Legal Officer, Debo Adesina (hereinafter, "ADESENA").

51.   During this phone conference, KOBASHER reiterated the concerns she had expressed by e-mail earlier in the day. She specifically noted that unethical processes were leading to unnecessary procedures which could render METRO VEIN CENTERS liable for prosecution under the law due to medical fraud.

52.   KOBASHER also specifically indicated that METRO VEIN CENTERS physicians were not following proper protocol with respect to their

review of diagnostic studies. She informed ADESINA and GOLDEN that physicians were not reviewing the ultrasound images, but were instead improperly relying upon the written reports of the technicians only.

53.    In response, GOLDEN and ADESINA asked KOBASHER what she was looking for. KOBASHER responded that she simply wanted the technicians to stop fraudulent practices at METRO VEIN CENTERS.

### Retaliation For Opposition to Fraud

54.    The day after her phone call with GOLDEN an ADESINA, KOBASHER was working at the METRO VEIN CENTERS facility in Dearborn, Michigan until 7:00PM.

55.    After 5:00PM, METRO VEIN CENTERS disabled KOBASHER's access to the computers and e-mail system.

56.    On or about July 23, 2020, KOBASHER was instructed to meet with IVANOV and METRO VEIN CENTERS board-member Andrew Provost.

57.    During this meeting, IVANOV and Mr. Provost informed KOBASHER that she was fired from her position with METRO VEIN CENTERS.

58.    METRO VEIN CENTERS terminated KOBASHER's employment in retaliation for her efforts to stop METRO VEIN CENTERs from presenting false or fraudulent medical claims in violation of The False Claims Act, 31

U.S.C. § 3729, *et seq.*, The Michigan Health Care False Claims Act, MCL § 752.1003, *et seq.*, and the Michigan Medicaid False Claims Act M.C.L. §400.607, *et seq.*

## COUNT I
### Unlawful Retaliation in Violation of the False Claims Act
*Against all Defendants*

59.    KOBASHER re-alleges and incorporates by reference the preceding paragraphs of her Complaint as though more specifically restated and set forth herein.

60.    While employed with METRO VEIN CENTERS, KOBASHER objected to and attempted to stop METRO VEIN CENTERS from knowingly presenting false or fraudulent claims by their technicians engaging in unethical practices designed to cause patients to receive unnecessary procedures.

61.    The practices to which KOBASHER objected in fact lead patients of METRO VEIN CENTERS to receive fraudulent and unnecessary medical procedures.

62.    Some of these fraudulent and unnecessary medical procedures performed by METRO VEIN CENTERS were in fact presented for reimbursement to the United States Government through the Centers for Medicare & Medicaid Services ("CMS").

15

63.    31 U.S.C. § 3729 provides, in relevant part:

Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim… is liable to the United States Government for a civil penalty of not less than $5,000.0 and not more than $10,000.00… plus 3 times the amount of damages which the Government sustains because of the act of that person.

64.    By opposing METRO VEIN CENTERS' unethical and fraudulent practices, described above, KOBASHER engaged in efforts to stop METRO VEIN CENTERS' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

65.    METRO VEIN CENTERS terminated KOBASHER's employment in retaliation for her efforts to stop METRO VEIN CENTERS' violations of the False Claims Act, *supra*.

66.    31 U.S.C. § 3730(h) provides as follows:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

67.    As a direct and proximate result of METRO VEIN CENTERS' retaliatory and unlawful discrimination, KOBASHER incurred damages,

including but not limited to a loss of compensation, loss of fringe benefits, embarrassment, humiliation, betrayal and emotional distress, and other incidental and consequential losses.

### COUNT II
### Violation of Michigan Whistleblower's Protection Act
*Against all Defendants*

68.    KOBASHER re-alleges and incorporates by reference the preceding paragraphs of her Complaint as though more specifically restated and set forth herein.

69.    MVC Clinical Practice, A and G Aesthetics, MVC MSO, and ALBARON are "employers" as that term is defined by the Whistleblower's Protection Act (hereinafter, "WPA").

70.    ADESINA is a licensed attorney and member of the State Bar of New York and the State Bar of Texas, and as such is a member of a public body within the meaning of the WPA.

71.    The U.S. Department of Health and Human Services Office of the Inspector General is a public body within the meaning of the WPA.

72.    KOBASHER was at all relevant times an individual employee within the meaning of the WPA.

73.     During her employment with METRO VEIN CENTERS, as alleged above, KOBASHER objected to unethical and illegal fraudulent diagnostic and billing practices performed by METRO VEIN CENTERS.

74.     These illegal practices were in violation of multiple state and federal laws, including but not limited to:

    a.  The False Claims Act, 31 U.S.C. § 3729 *et seq.*;

    b.  Michigan's Prohibition on Common Law Fraud, M.C.L § 750.280;

    c.  The Michigan Public Health Code, M.C.L. §333.2894;

    d.  The Michigan Consumer Protection Act, M.C.L. §445.901 *et seq.*;

    e.  The Michigan Health Care False Claims Act, M.C.L. §752.1001 *et seq.;* and

    f.  The Michigan Medicaid False Claims Act, M.C.L. §400.601 *et seq.*

75.     On or about June 2, 2020, KOBASHER reported METRO VEIN CENTERS' violation of law to the U.S. Department of Health and Human Services, Office of the Inspector General.

76.   On or about July 21, 2020, KOBASHER reported METRO VEIN CENTERS violation of law to ADESINA by e-mail correspondence and telephone communication.

77.   The WPA prohibits employers from discharging or otherwise discriminating against an employee because that employee has reported or is about to report a violation or suspected violation of law to a member of a public body.

78.   Defendants METRO VEIN CENTERS decision to terminate KOBASHER's employment was motivated, in whole or in part, by retaliatory animus resulting from KOBASHER's actions of reporting and/or being about to report the violations of law described above to a member of a public body in violation of the WPA.

79.   Defendants actions in violating KOBASHER's rights under the WPA were intentional.

80.   As a direct and proximate result of Defendants' wrongdoing, KOBASHER has suffered damages including but not limited to loss of earnings, loss of earning capacity, past and future lost earnings, the value of fringe and retirement benefits, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary

pleasures of everyday life, and the loss of the ability to pursue employment of choice.

## COUNT III
### Wrongful Discharge in Violation of Michigan Public Policy
*Against all Defendants*

81.   KOBASHER re-alleges and incorporates by reference the preceding paragraphs of her Complaint as though more specifically restated and set forth herein.

82.   During the course of her employment with Defendants, KOBASHER refused to acquiesce in violations of law, and directly objected to METRO VEIN CENTERS' fraudulent and illegal practices to METRO VEIN CENTERS' executives and upper management.

83.   In objecting to METRO VEIN CENTERS' technicians unethical and unlawful diagnostic practices, KOBASHER communicated to METRO VEIN CENTERS that she would not participate or engage in activities that were fraudulent or illegal.

84.   METRO VEIN CENTERS' decision to terminate KOBASHER's employment violates the clearly established public policy of the State of Michigan and constitutes a wrongful discharge.

85.   As a direct and proximate result of Defendants' wrongdoing, KOBASHER has suffered damages including but not limited to loss of

earnings, loss of earning capacity, past and future lost earnings, the value of fringe and retirement benefits, lost job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of enjoyment of the ordinary pleasures of everyday life, and the loss of the ability to pursue employment of choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, CAROLYN KOBASHER, demands judgment against each of the Defendants as follows:

A. Plaintiff prays that the Court exercise its equitable power under the WPA and the False Claims Act and immediately reinstate her to the position of Ultrasound Manager;

B. Award Plaintiff all lost wages and restore all fringe benefits, past (backpay) and future (frontpay), that she has or will suffer;

C. Award Plaintiff compensatory damages for the mental anguish and emotional distress that she has suffered, in addition to the harm that Defendants have inflicted upon Plaintiff's reputation and future employability;

D. Award Plaintiff exemplary damages;

E.      Award Plaintiff's reasonable attorney fees, costs and interest; and

F.      Award such other relief as this Court deems just and proper.

Respectfully submitted,

GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C.,

_____
Greg Jones (P75318)
Attorneys for Plaintiff
30500 Northwestern Hwy, Ste 425
Farmington Hills, MI 48334
248-865-0001

Date: October 21, 2020

## DEMAND FOR TRIAL BY JURY

Plaintiff CAROLYN KOBASHER, by her attorneys GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C., demands a trial by jury.

Respectfully submitted,

GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C.,

_____

Greg Jones (P75318)
Attorneys for Plaintiff
30500 Northwestern Hwy, Ste 425
Farmington Hills, MI 48334
248-865-0001

Date: October 21, 2020